THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MICHELLE MARGO STURGES,                    :
:
              **Plaintiff**                :
:          **3:12-CV-01633**
         **vs.**                           :
:          **(Judge MARIANI)**
CAROLYN W. COLVIN, ACTING                  :
COMMISSIONER OF SOCIAL                     :
SECURITY,                                  :
:
              **Defendant**                :

## MEMORANDUM

### Background

The above-captioned action is one seeking review of a decision of the
Commissioner of Social Security ("Commissioner") denying Plaintiff Michelle Margo
Sturges's claim for social security disability insurance benefits.

Sturges protectively filed her application for disability insurance benefits on
November 24, 2008. Tr. 97-104 and 113.[1] The application was initially denied by the
Bureau of Disability Determination[2] on June 23, 2009. Tr. 12 and 65-69. On August 12,
2009, Sturges requested a hearing before an administrative law judge. Tr. 12 and 72-73.
After about 13 months had passed, a hearing was held on September 8, 2010. Tr. 38-62.
Sturges was represented by counsel at the hearing. Id. On October 27, 2010, the
administrative law judge issued a decision denying Sturges's application. Tr. 12-26. As
will be explained in more detail *infra* the administrative law judge found that Sturges

---

1.    References to "Tr.\_" are to pages of the administrative record filed by the
Defendant as part of the Answer on December 13, 2012.

2.    The Bureau of Disability Determination is an agency of the state which initially
evaluates applications for disability insurance benefits on behalf of the Social Security
Administration. Tr. 66.

failed to prove that she met the requirements of a listed impairment or suffered from

work-preclusive functional limitations. Id. Instead Sturges had the ability to perform a

limited range of light work,[3] including as a ticket taker, locker room or check room

attendant, photocopy clerk and order filler. Tr. 26. On December 22, 2010, Sturges filed

a request for review with the Appeals Council and after about 18 months had elapsed the

---

3. The terms sedentary, light, medium, heavy and very heavy work are defined in the
regulations of the Social Security Administration as follows:

> (a) *Sedentary work.* Sedentary work involves lifting no more than 10
> pounds at a time and occasionally lifting or carrying articles like docket
> files, ledgers, and small tools. Although a sedentary job is defined as one
> which involves sitting, a certain amount of walking and standing is often
> necessary in carrying out job duties. Jobs are sedentary if walking and
> standing are required occasionally and other sedentary criteria are met.

> (b) *Light work.* Light work involves lifting no more than 20 pounds at a
> time with frequent lifting or carrying of objects weighing up to 10 pounds.
> Even though the weight lifted may be very little, a job is in this category
> when it requires a good deal of walking or standing, or when it involves
> sitting most of the time with some pushing and pulling of arm or leg
> controls. To be considered capable of performing a full or wide range of
> light work, you must have the ability to do substantially all of these
> activities. If someone can do light work, we determine that he or she can
> also do sedentary work, unless there are additional limiting factors such
> as loss of fine dexterity or inability to sit for long periods of time.

> (c) *Medium work.* Medium work involves lifting no more than 50 pounds at
> a time with frequent lifting or carrying of objects weighing up to 25 pounds.
> If someone can do medium work, we determine that he or she can do
> sedentary and light work.

> (d) *Heavy work.* Heavy work involves lifting no more than 100 pounds at a
> time with frequent lifting or carrying of objects weighing up to 50 pounds.
> If someone can do heavy work, we determine that he or she can also do
> medium, light, and sedentary work.

> (e) *Very heavy work.* Very heavy work involves lifting objects weighing
> more than 100 pounds at a time with frequent lifting or carrying of objects
> weighing 50 pounds or more. If someone can do very heavy work, we
> determine that he or she can also do heavy, medium, light and sedentary
> work.

20 C.F.R. § 404.1567.

Appeals Council on June 26, 2012, concluded that there was no basis upon which to grant Sturges's request for review. Tr. 1-8.

Sturges then filed a complaint in this court on August 17, 2012. Supporting and opposing briefs were submitted and the appeal became ripe for disposition on March 14, 2013, when Sturges elected not to file a reply brief.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." It is undisputed that Sturges met the insured status requirements of the Social Security Act through December 31, 2012. Tr. 23-24 and 138.

Sturges was born in the United States on September 22, 1971, and at all times relevant to this matter was considered a "younger individual"[4] whose age would not seriously impact her ability to adjust to other work. 20 C.F.R. § 404.1516(c); Tr. 42, 64, 97 and 106.

Sturges, who obtained a General Equivalency Diploma (GED) in March 1991, can read, write, speak and understand the English language and perform basic mathematical functions. Tr. 43, 124 and 133. During her schooling, Sturges attended regular education classes.[5] Tr. 134. After obtaining a GED, Sturges in 1992 received training in emergency medical technology. Id.

---

4.   The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). At the time of the administrative hearing Sturges was 38 years old.

5.   The record does not reveal in what grade or when Sturges quit attending school.

Sturges's work history covers 14 years and at least 8 different employers. Tr. 107-111. The records of the Social Security Administration reveal that Sturges had earnings in the years 1988 through 1993 and 2001 through 2008. Tr. 107. Sturges's annual earnings range from a low of $1413.71 in 1993 to a high of $20,924.20 in 2006. Id. Sturges's total earnings during those 14 years were $148,877.19. Id.

Sturges in a document filed with the Social Security Administration stated that she worked as a waitress for a country club from April, 2001 to August, 2001 (8 hours per day, 5 days per week); as a child care assistant for a day care center from August, 2001 to February, 2002 (8 hours per day, 5 days per week); as an office worker for a construction company from February, 2002 to May, 2002 (8.5 hours per day, 5 days per week); as a sales associate/stock person for Wal-Mart Associates, Inc. ("Wal-Mart"), from July, 2002 to October, 2003 (8 hours per day, 5 days per week); as a department manager for Wal-Mart from October, 2003 to October, 2006 (8 hours per day, 5 days per week); as an assistant manager trainee for Wal-Mart from October, 2006 to March, 2007 (8 hours per day, 5 days per week); as an assistant store manager for Wal-Mart from March, 2007 to September, 2007 (11.5 hours per day, 6 days per week); and as a receptionist for C & L Marketing, Inc., a travel agency, from February, 2008 through May, 2008 (30 hours per week).[6] Tr. 43-44 , 110-111, 118-119 and 136-146.

---

6. Sturges had earnings in the amount of $1571.16 from Wal-Mart in 2008. However, it appears that Sturges took a leave of absence from Wal-Mart in September, 2007, and that the 2008 earnings from Wal-Mart are attributable to sick or vacation leave. Tr. 43-44 and 111.

4

Sturges has past relevant employment[7] as (1) a telemarketer which was described as semi-skilled, sedentary work by a vocational expert; (2) a department store manager which was described as skilled, sedentary work as normally performed in the economy but medium work as actually performed by Sturges; (3) a child care attendant described as semi-skilled, light work; (4) a waitress described as semi-skilled, light work; and (5) a sales/stock person described as unskilled, medium work. Tr. 54.

Sturges contends that she became disabled on September 29, 2007, because of physical impairments, including severe neck and spine pain, fibromyalgia, headaches, vomiting, shoulder blade pain, radiating pain down her arms, involuntary spasms and movements of the legs, weakness in the arms, vertigo, dizziness, black out spells, muscular spasms in the neck and back, and loss of urinary and bowel function. Tr. 125. Subsequently, in August, 2009, she claimed that she suffered from "dead" arms and legs; her "shooting pains" had "all gotten worse;" and she suffered from disabling depression. Tr. 176. In the brief submitted in support of the present appeal Sturges asserts that she had cervical spine surgery in 2009 and that after the surgery she continued to have radiating pain in her arms, elbows, wrists and fingers; she drops things because of lack of sensation in her hands and arms; she has difficulty lifting her arms and hands; she can only write for a short amount of time without experiencing shooting pains in the elbows, wrists and fingers; she cannot grasp a carton of milk; she drags her left leg; and she has debilitating headaches which occur everyday and cause her to vomit and lose vision. Doc. 8, Plaintiff's Brief, pp. 3-4.

---

7.     Past relevant employment in the present case means work performed by Sturges during the 15 years prior to the date her claim for disability was adjudicated by the Commissioner. 20 C.F.R. §§ 404.1560 and 404.1565.

5

For the reasons set forth below we will affirm the decision of the Commissioner denying Sturges's application for disability insurance benefits.

**Standard of Review**

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more

than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at
1213. In an adequately developed factual record substantial evidence may be
"something less than the weight of the evidence, and the possibility of drawing two
inconsistent conclusions from the evidence does not prevent an administrative agency's
finding from being supported by substantial evidence." Consolo v. Federal Maritime
Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in
the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record
fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488
(1971). A single piece of evidence is not substantial evidence if the Commissioner
ignores countervailing evidence or fails to resolve a conflict created by the evidence.
Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was
accepted, which evidence was rejected, and the reasons for rejecting certain evidence.
Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the
decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano,
637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir.
1979).

## Sequential Evaluation Process

To receive disability benefits, the plaintiff must demonstrate an "inability to
engage in any substantial gainful activity by reason of any medically determinable
physical or mental impairment which can be expected to result in death or which has
lasted or can be expected to last for a continuous period of not less than 12 months." 42
U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his
> physical or mental impairment or impairments are of such severity that he is
> not only unable to do his previous work but cannot, considering his age,

7

> education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims.  See 20 C.F.R. §404.1520; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[8] (2) has an impairment that is severe or a combination of impairments that is severe,[9] (3) has an impairment or combination of impairments that meets or equals the requirements of a listed

---

8.   If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit."  20 C.F.R. § 404.1510.

9.   The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two.  Id.  If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. § 404.1520(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 404.1523 and 404.1545(a)(2). An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant to perform basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 404.1545(b).  An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).

impairment,[10] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[11]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id; 20 C.F.R. § 404.1545; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

### Medical Records

Before we address the administrative law judge's decision and the arguments of counsel, we will review some of Sturges's medical records. Initially, we will note that the relevant time period is from September 29, 2007, the alleged disability onset date, to October 27, 2010, the date the administrative law judge issued a decision denying Sturges's application. After the administrative law judge issued his decision,

---

10.    If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step.

11.    If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

Sturges submitted additional records to the Appeals Council. Those records are irrelevant with respect to our review of the present appeal.[12]

On September 29, 2007, Sturges had an appointment at a Geisinger Clinic in Mt. Pocono, Pennsylvania, with Levelle D. Bigatel, M.D., regarding complaints of joint pain, a cough, a runny nose and some shortness of breath. Tr. 203-204. It was reported that Sturges had started smoking again.[12] Id. Sturges reported some mild shortness of breath and vomiting a couple days before the appointment but denied weakness and suicidal thoughts. Id. The results of a physical examination performed by Dr. Bigatel were essentially normal, including Sturges's gait was normal, she exhibited no joint deformity, effusion or inflammation, and she had normal muscle strength and tone. Id. The only adverse objective findings recorded by Dr. Bigatel were that Sturges had some sinus tenderness and initially she had some tremors and was crying but she calmed down and the tremors and crying resolved. Id. The diagnostic assessment was that

_____

12. Evidence submitted after the administrative law judge's decision cannot be used to argue that the administrative law judge's decision is not supported by substantial evidence. Matthews v. Apfel, 239 F.3d 589, 594-595 (3d Cir. 2001). The only purpose for which such evidence can be considered is to determine whether it provides a basis for remand under sentence 6 of section 405(g), 42 U.S.C. Szubak v. Secretary of Health and Human Servs., 745 F.2d 831, 833 (3d Cir. 1984). Under sentence 6 of section 405(g) the evidence must be "new" and "material" and a claimant must show "good cause" for not having incorporated the evidence into the administrative record. Id. The Court of Appeals for the Third Circuit explained that to be material "the new evidence [must] relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition." Id. Sturges has not established "good cause" for not having incorporated the evidence into the administrative record. In fact, she has not even attempted to argue that she meets the requirement for a remand under sentence 6 of section 405(g).

12. It is reported in the medical literature that smoking is bad for patients undergoing spinal surgery because it can cause a number of significant problems including decreased rate of healing and success of the surgery. See, generally, Larry Davidson, M.D., Cigarette Smoking and Its Impact on Spinal Fusions, spinuniverse, http://www.spineuniverse.com/treatments/surgery/cigarette-smoking-its-impact-spinal-fu sions (Last accessed April 21, 2014).

Sturges suffered from acute sinusitis for which the antibiotic Augmentin was prescribed; muscle pain and inflammation based on a mildly elevated CPK blood test for which Sturges was prescribed the drug Celebrex and referred to a rheumatologist for a consultation; and depression and anxiety for which the antidepressant Celexa was prescribed and she was referred to Matthew R. Kozma, D.O., a family practitioner in Mt. Pocono, for a follow-up appointment. Id.

On October 9, 2007, Sturges had an appointment with Dr. Kozma for complaints of pain in her hands, wrists, elbows, knees, neck, and shoulder. Tr. 209. Dr. Kozma noted that there were no visible signs of swelling and that Sturges had good range of motion while taking care of her two children in the office. Id. The results of a physical examination were essentially normal. Id. Sturges was alert and oriented to person, place and time; she had fluent speech; she had no focal motor or sensory deficits; and her gait was normal. Id.

The next relevant record that we encounter is a record of an appointment Sturges had with Beth Cohen, M.D., on July 28, 2008, for a neurological evaluation. Tr. 391-392. A physical examination on that date revealed that Sturges had marked spasms in the right trapezius muscle as well as tenderness; she had tenderness to palpation over the lumbosacral spine; she had no definitive trigger points consistent with fibromyalgia;[13]

_____

13.    "Fibromyalgia is a disorder characterized by widespread musculoskeletal pain accompanied by fatigue, sleep, memory and mood issues." Fibromyalgia, Definition, Mayo Clinic staff, http://www.mayoclinic.org/diseases-conditions/fibromyalgia /basics/definition/con-20019243 (Last accessed April 21, 2014). At one point fibromyalgia was only diagnosed if a patient had 11 out of 18 positive tender points. Presently, a diagnosis can be made if a patient has widespread pain for more than 3 months with no underlying medical condition that could cause the pain. There is no blood test or objective criteria for such a diagnosis to be made. However, some
(continued...)

11

she had markedly restricted range of motion of the cervical spine with respect to lateral
rotation, forward flexion and extension; she had diminished sensation in the left hand;
she had diminished vibratory sensation of a moderate degree in the right lower extremity
and a mild degree in the left lower extremity; she had a right palmomental reflex;[14] she
had a positive Hoffman sign on the left hand;[13] and a slightly wobbling gait. Tr. 391-392.
However, it was also reported that Sturges was alert and oriented to person, place and
time;  her higher cortical function was intact; she had clear speech and no evidence of
aphasia;[14] she had normal muscle bulk and tone; she had normal coordination; she had
no adventitious (unusual) movements;  she had normal (5/5) muscle strength in the
upper and lower extremities; and she had normal reflexes in the upper and lower
extremities. Id.  Dr. Cohen's diagnostic assessment was somewhat differential. Id.  She

---

13.   (...continued)
physician still rely on the tender point examination and attempt to rule out other
possible causes, including rheumatological and autoimune disorders. Fibromyalgia,
Tests and diagnosis,  Mayo Clinic staff, http://www.mayoclinic.org/diseases-conditions/
fibromyalgia/basics/tests-diagnosis/con-20019243 (Last accessed April 21, 2014).

14.   This is a reflex in a muscle of the chin elicited by stroking a specific part of the
palm.  It can suggest a brain pathology. See, generally, G. Owen and G. Malley, The
palmomental reflex: a useful clinical sign?, Journal of Neurology, Neurosurgery &
Psychiatry, http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1738000/ (Last accessed April
21, 2014).

13.   The Hoffman's sign is a neurological sign in the hand which is suggestive of
spinal cord compression. The test involves tapping the nail on the third and fourth
finger. "The test is positive for spinal cord compression when the tip of the index finger,
ring finger, and/or thumb suddenly flex in response." Hoffman Sign: Red Flag for
Cervical Myelopathy, Orthopod,http://www.eorthopod.com/content/hoffmann-sign-red
-flag-for-cervical-myelopathy (Last accessed April 11, 2014).

14.   Aphasia is a problems in communication, both verbal and written, e.g., using
short or incomplete sentences, unrecognizable words, or using sentences that do not
make sense.

noted that the signs and symptoms suggested cervical myelopathy but she also mentioned lumbosacral radiculopathy,[15] probable pelvic instability, fibromyalgia or other toxic metabolic causes, and loss of awareness, presyncope possibly hypoglycemic in nature. Tr. 392. Dr. Cohen recommended, inter alia, lab work, an MRI of the cervical and lumbosacral spine, electrodiagnostic tests and physical therapy. Id. She also started Sturges on the nonsteroidal anti-inflammatory drug Mobic, the muscle relaxant Robaxin and the antidepressant Pamelor. Id.

Sturges on September 6, 2008, had a nerve conduction study of the bilateral upper extremities and on September 9, 2008, an electromyogram of the bilateral upper extremities. Tr. 397. The results of those electrodiagnostic tests were normal and specifically revealed "no evidence for a mononeuropathy of the left upper extremity or cervical (motor) radiculopathy." Id.

An MRI of Sturges's lumbar spine performed on September 8, 2008, revealed minimal disc bulging at the L5-S1 levels; no focal disc herniation, spinal canal narrowing, or neural foraminal narrowing at any lumbar level; and mild levoscoliosis of the lumbar spine.[16] Tr. 295. Also, on September 8, 2008, Sturges had an MRI of the cervical spine which revealed a decrease in the intervertebral disc height from C3-C6

---

15. Radiculopathy is a condition where one or more nerves or nerve roots are affected and do not work properly. The nerve roots are branches of the spinal cord. They carry signals to the rest of the body at each level along the spine. Radiculopathy is a result of disc herniation or an injury causing foraminal impingement of an exiting nerve (the narrowing of the channel through which a nerve root passes). See, generally, Radiculopathy, MedicineNet.com, http://www.medicinenet.com/radiculopathy/article. htm (Last accessed April 21, 2014). A herniated disc is one cause of radiculopathy. Id.

16. Scoliosis is an abnormal curvature of the spine: left, right, forward or backward. The term levoscoliosis is specifically used for a leftward curvature of the spine, a curvature that could impact the heart.

level, reversal of the lordotic (normal) curvature, mild retrolisthesis (C3 on C4),[15] disc

bulges and herniations, osteophyte (spur) complexes, uncinate hypertrophy, facet

arthropathy, narrowing of the thecal sac, and neural foraminal narrowing. Tr. 296-297. At

the C3-C4 level there was moderate right neural foraminal narrowing caused by uncinate

hypertrophy and facet arthropathy and a disc bulge which caused minimal to mild

narrowing of the thecal sac; at the C4-C5 level there was a disc bulge which caused a

mild impression of the thecal sac; at the C5-C6 level there was a disc herniation which

contacted the cervical spinal cord without significant compression; and at the C6-C7 level

there was a disc bulge and uncinate hypertrophy which caused slight impression of the

left neural foramen but without compression.[15] Tr. 296.

---

15.   A retrolisthesis is a backward slippage of a vertebra relative to the one below it and an anterolisthesis is a forward slippage of a vertebra relative to the one below it.

15.   The spine consists of several elements including vertebral bodies and intervertebral discs. The intervertebral discs (made of cartilage) are the cushions (shock absorbers) between the bony vertebral bodies that make up the spinal column. Each disc is made of a tough outer layer and an inner core composed of a gelatin-like substance.
      Degenerative disc disease is the wear and tear and breakdown of the intervertebral discs as a person grows older.  It is a process that can result from the dehydration of the discs as well as an injury to the spine. The breakdown of the intervertebral discs can result in discs bulging, protruding or herniating as well as the inner gelatin-like core of the disc extruding outside the outer layer. These conditions sometimes obstruct the openings (foramen) along the spine through which nerve roots exit. This condition is known as neural foraminal narrowing or stenosis. They can also result in a narrowing of the spinal canal or spinal stenosis. Such bulges, protrusions and herniations if they contact nerve tissue can cause pain.
      Degenerative joint disease (or osteoarthritis) is a breakdown of the cartilage between joints.  In the spine there are facet joints which are in the back of the spine and act like hinges. There are two superior (top) and two inferior (bottom) portions to each facet joint called the superior and inferior articular processes. These joints are covered with cartilage and the wear and tear of these joint is known as facet arthropathy (arthritis). This wear and tear of the facet joints result in loss of cartilage and can cause pain. The uncinate is a bony hooked-shaped process on the side edges of the top

(continued...)

On September 11, 2008, Sturges had a CT scan of the brain performed at the Pocono Medical Center which revealed "no evidence of acute intracranial abnormality." Tr. 293.

On September 12, 2008, Sturges had an appointment with Dr. Cohen at which Sturges reported new symptoms of "a headache behind her eye and over the left side of her face and neck." Tr. 390. The record of this appointment sets forth only minimal objective physical examination findings. Id. Dr. Cohen noted "a clearly peripheral 7th nerve palsy of a mild degree." Id. Dr. Cohen's diagnostic assessment was that Sturges suffered from Bell's Palsy possibly caused by the Herpes zoster virus, but she ordered an MRI of the brain and laboratory test to rule out other causes.[16] Id. An addendum to the report of this appointment notes "[w]e will discuss smoking cessation at her next visit." Id. An MRI of Sturges's brain was also performed on September 12, 2008, and revealed no significant abnormalities. Tr. 293.

---

15.   (...continued)
surface of a vertebral body. Uncinate hypertrophy is an enlargement of this hooked-shaped process.
      The thecal sac is an elongated tube that extends from the brain to the end of the spine in which the spinal cord and nerve roots run. It is a covering (membrane) that surrounds the spinal cord and contains cerebral spinal fluid. Herniated discs which impinge the thecal sac may or may not cause pain symptoms.

16.   Bell's Palsy is a paralysis of the muscles of the face usually only on one side. Bell's Palsy, Definition, Mayo Clinic staff, http://www.mayoclinic.org/diseases-conditions/bells-palsy/basics/definition/con-20020529 (Last accessed April 21, 2014). The most common cause of Bell's palsy appears to be the herpes simplex virus, which also causes cold sores and genital herpes. Other viruses that have been linked to Bell's palsy include the virus that causes chickenpox and shingles (herpes zoster), the virus that causes mononucleosis (Epstein-Barr), and another virus in the same family (cytomegalovirus). Bell's Palsy, Causes, Mayo clinic staff, http://www.mayoclinic.org/diseases-conditions/bells-palsy/basics/causes/con-20020529 (Last accessed April 21, 2014).

On September 19, 2008, Sturges had a follow-up appointment with Dr. Cohen. Tr. 389. Dr. Cohen reported that (1) Sturges was doing better; (2) Sturges's white blood count was elevated but this elevation was noted as possibly caused by a virus infection; and (3) the MRI of the brain performed on September 12th was unremarkable. Id.

A nerve conduction study and an electromyogram of the bilateral lower extremities performed on September 20 and October 3, 2008, respectively, were normal. Tr. 395. These tests revealed "no electrodiagnostic evidence for a lumbosacral (motor) radiculopathy." Id. Thereafter, on October 7, 2008, Dr. Cohen noted that Sturges was doing well in terms of her Bell's Palsy, which had improved "significantly," but that she still had problems with her neck. Tr. 388. Dr. Cohen reviewed the results of the MRI of Sturges cervical spine and noted that there was a disc herniation at the C5-C6 level which was impressing on the thecal sac and displacing it posteriorly. Id. Dr. Cohen recommended a different muscle relaxer, and noted that Sturges had not pursued physical therapy because of childcare issues, but advised Sturges that she should try to engage in physical therapy, as well as decreasing activities that would require more than five pounds of lifting. Id.

On October 17, 2008, Sturges underwent a sleep deprived electroencephalogram. Tr. 393. Dr. Cohen reported that the results were normal. Id.

On November 7, 2008, Sturges had a follow-up appointment with Dr. Cohen at which Sturges had multiple complaints, including hearing loss in the left ear, a weak left arm, pain radiating into the arms, headaches with photophobia and jaw pain. Tr. 385. A physical examination of Sturges performed by Dr. Cohen revealed that

16

Sturges was markedly tender to palpation over the C3 through C7 levels of the cervical spine; Sturges had paraspinal spasm and tenderness to palpation in the cervical and trapezius areas; Sturges had positive Hoffman's tests bilaterally; and she had a tendency to drag her left leg. Id. However, Sturges had essentially normal muscle strength in the bilateral upper extremities; and she had normal sensation and reflexes. Tr. 385 and 387. Dr. Cohen noted that Sturges had not received any type of therapy, and she recommended another MRI of the cervical spine and a neurological consult. Tr. 385-386.

On November 14, 2008, Sturges had an MRI of the cervical spine which demonstrated a small disc herniation at the C5-C6 level; mild to moderate right-sided C3-C4 spondylolysis[17] and foraminal narrowing; and moderate C3-C4 and C5-C6 and mild C4-C5 degenerative disc disease. Tr. 291. An addendum to this MRI noted that when compared to the previous examination, the disc herniation at the C5-C6 level is slightly decreased in size and otherwise the degenerative changes within Sturges's cervical spine were grossly stable. Tr. 292.

On November 18, 2008, Sturges reported doing "much better," she had not had a headache in four days, and she further reported that she was tolerating her medications well. Tr. 383. Dr. Cohen's diagnostic impression was that Sturges suffered from migraine headaches (but noted that she was doing better on the drug Calan)[18] and

---

17. A vertebra consists of several elements, including the vertebral body (which is the anterior portion of the vertebra), pedicles, laminae and the transverse processes. Spondylolysis is basically a stress fracture or breakdown of the components of a vertebra. See Dorland's Illustrated Medical Dictionary, 1754 (32nd Ed. 2012).

18. Calan (generic verapamil) is a medication used to treat high blood pressure, chest pain and heart rhythm disorders. It can be used for other purposes not specified in the medication guide. Calan, Drugs.com, http://www.drugs.com/mtm/calan.html (Last
(continued...)

left C5-C6 radiculopathy secondary to a disc herniation. Id.  Dr. Cohen strongly urged

Sturges to pursue the physical therapy which had been previously recommended. Id.

   Also, on November 18, 2008, Sturges was examined by Nicholas Rini, a

physicians assistant, while in the presence of Chris Lycette, M.D. Tr. 419-422.  During a

review of Sturges's systems,[19] Sturges denied fatigue, general weakness, decreased

hearing, back  pain and having a sleep disorder. Tr. 419.  The results of a

physical/neurological examination were essentially normal. Tr. 420-422.  Sturges had a

normal posture and gait; she had normal range of motion in her upper and lower

extremities; she had fluent speech and intact cognition; she had a normal inspection of

the cervical spine without deformity; she had negative Hoffman's tests bilaterally; she had

normal muscle strength other than slightly reduced strength (4+/5) in some of the upper

extremity muscle groups;[20] she had a normal sensory examination; her deep tendon

reflexes were slightly reduced (1+) but symmetric and thus considered normal;[21] and she

---

18. (...continued)
accessed April 21, 2014).

19. "The review of systems (or symptoms) is a list of questions, arranged by organ
system, designed to uncover dysfunction and disease." A Practical Guide to Clinical
Medicine, University of California, School of Medicine, San Diego,
http://meded.ucsd.edu/clinicalmed/ros.htm (Last accessed April 21, 2014).

20. Muscle strength is graded on a scale of 0 to 5.  Sometimes a medical provider
will also grade strength in half increments using a minus sign or a plus sign. 4/5 muscle
strength indicates that "movement [is] possible against some resistance by the
examiner[.]" Neuroexam, Strength of Individual Muscle Groups, http://www.neuroexam.
com/neuroexam/content.php?p=29 (Last accessed April 22, 2014). 5/5 is normal
muscle strength. Id.

21. "Deep tendon reflexes are normal if they are 1+, 2+ or 3+ unless they are
asymmetric[.]" Deep Tendon Reflexes, neuroexam.com, http://www.neuroexam.com/
neuroexam/content.php?p=31 (Last accessed April 21, 2014).

18

exhibited no clonus (reflex tremors). Id. It was noted that an MRI of the cervical spine demonstrated degenerative changes at the C5-C6 level of the cervical spine with a disc herniation and stenosis. Tr. 422. It was recommended that Sturges consider epidural steroid injections. Id. Sturges requested time to consider her options and a follow-up appointment was scheduled in 4 weeks. Id. The follow-up appointment occurred on December 16, 2008, and Sturges was again examined by Mr. Rini. Tr. 414-417. The results of a physical examination were essentially the same as those that were reported on November 18, 2008. Id. It was also noted that Sturges was smoking ½ pack of cigarettes per day. Id. At the conclusion of this appointment Sturges agreed to a series of epidural steroid injections before considering surgery. Tr. 417.

At the request of Dr. Lycette, on January 19, 2009, Sturges had a consultation with Steven Mazza, M.D., who was affiliated with CHS Professional Practice, P.C., Department of Physical Medicine and Rehabilitation. Tr. 344-345. At that appointment Sturges complained "of a litany of aches and pains throughout her entire body" which had been "ongoing [] since adolescence." Tr. 344. Sturges complained, inter alia, of neck pain, upper extremity pain and weakness, generalized fatigue, urinary frequency and incontinence, alternating constipation and diarrhea, night sweats, joint pain, joint swelling, muscle pain, muscle cramps, back pain, frequent headaches, and eye pain. Id. Dr. Mazza observed that Sturges had "faint, yet pressured, speech as if she [was] on the verge of crying." Tr. 345. Sturges also "rolled-forward her shoulder posture with her head forward." Id. She was able to "squat easily to deal with her small children" and she had a normal stance and gait. Id. Dr. Mazza reported that Sturges's cervical range of motion was limited especially in forward flexion but he did not note the

19

degree of limitation. Id. Sturges had diffuse generalized weakness in the upper
extremities but no focal neurologic deficits and her strength was rated by Dr. Mazza as
normal (5/5) in all major muscle groups in the upper extremities. Id. Sturges also had
normal sensation in the bilateral upper extremities and negative bilateral straight leg
raising tests.[22] Id. After performing the physical examination, Dr. Mazza agreed to
proceed with epidural steroid injections. Id.

On January 27, 2009, Dr. Mazza administered an epidural steroid injection
to the interlaminar space of the C7-T1 levels of the cervical and thoracic spine. Tr. 350-
351. At a follow-up appointment with Dr. Mazza on February 4, 2009, Sturges reported
"some substantial relief," "some increased functional capabilities," she was "doing
relatively well"and "had no other new issues." Tr. 341. Dr. Mazza observed that Sturges
had a normal gait and stance; Sturges had limited cervical range of motion without
specifying the degree of limitation; she had tenderness and spasms in the cervical
paraspinal and trapezius musculature bilaterally; she had normal strength and sensation
in the upper extremities bilaterally; and she had negative Spurling's tests bilaterally.[23] Id.

---

22.    The straight leg raise test is done to determine whether a patient with low back
pain has an underlying herniated disc.  The patient, either lying or sitting with the knee
straight, has his or her leg lifted.  The test is positive if pain is produced between 30 and
70 degrees. Niccola V. Hawkinson, DNP, RN, Testing for Herniated Discs: Straight Leg
Raise, SpineUniverse, http://www.spineuniverse.com/experts/testing-herniated
-discs-straight-leg-raise (Last accessed April 21, 2014).

23.    The Spurling's test is an examination to determine whether a patient suffers from
cervical spondylosis or radiculopathy.  It is an "evaluation for cervical nerve root
impingement in which the patient extends the neck and rotates and laterally bends the
head toward the symptomatic side; an axial compression force is then applied by the
examiner through the top of the patient's head; the test is considered positive when the
maneuver elicits the typical radicular arm pain." MediLexicon, Definition:'Spurling Test,"
http://www.medilexicon.com/medicaldictionary.php?t=90833 (Last accessed October
(continued...)

Dr. Mazza administered repeat C7-T1 interlaminar epidural steroid injections on February 17 and March 3, 2009. Tr. 346 and 348. In the interim Sturges had an appointment with Dr. Cohen on February 26, 2009, but Dr. Cohen did not complete an evaluation or physical examination at that appointment because Sturges was accompanied by her 2 children who were hysterically crying. Tr. 381. Sturges did report headaches and numbness in her left arm and leg, but also noted that the epidural steroid injections may be helping her neck pain somewhat. Id. Dr. Cohen rescheduled the appointment. Id.

On March 13, 2009, Sturges had an appointment with Jena M. Hosband, a physicians assistant, associated with Dr. Mazza's practice. Tr. 336-337. Sturges reported that she had neck and arm pain and that she underwent three epidural steroid injections and that the first one provided some relief but that the second and third injections "made her worse." Tr. 336. A physical examination revealed that Sturges walked with a normal gait; she had limited cervical range of motion but the degree of limitation was not specified; her feet were slightly discolored but there was no evidence of any significant neurovascular compromise; and she had grossly intact strength and sensation. Tr. 337.

On April 3, 2009, Sturges visited the emergency department of the Pocono Medical Center complaining of abdominal pain. Tr. 321-329. A physical examination was performed and numerous diagnostic tests were ordered, including a CT scan of the abdomen. Id. The physical examination of the abdomen revealed moderate tenderness in the right lower quadrant and positive peritoneal signs, i.e., rigidity and a tender

---

23.   (...continued)
18, 2011).

21

McBurney's point.[24] Tr. 326. The CT scan revealed a "small amount of fluid in the pelvic cul-de-sac and bilateral adnexal masses."[25] Tr. 333. Sturges was discharged from the hospital on the same day and referred to an outside physician for an abdominal ultrasound. Tr. 328. The discharge diagnosis was abdominal pain, adnexal masses and fibroids. Id. With that background, the record of this emergency department visit is notable because it reveals that Sturges (1) ambulated without assistance; (2) when a medical provider reviewed Sturges's systems, Sturges denied fatigue, joint pain, back pain, headaches, paresthesias (tingling or pins and needles sensation), and depression; and (3) a physical examination revealed normal neck range of motion, no tenderness in the back to palpation, normal muscular strength and normal sensation. Tr. 324-326. Also, it was reported with respect to her psychiatric condition that she was oriented to person, place and time and she had a normal affect. Tr. 326.

On April 28, 2009, Louis B. Bonita, M.D., reviewed Sturges's medical records on behalf of the Bureau of Disability determination and concluded that Sturges had the ability to engage in a limited range of light work. Tr. 352-358. Dr. Bonita stated that Sturges could occasionally lift and carry 20 pounds; frequently lift and carry 10 pounds; stand and/or walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; and had an ability to push or pull with the lower extremities (other than limited to the weight designated for lifting and carrying). Tr. 353. Sturges also could frequently use ramps and climb stairs and occasionally climb ladders but never ropes or

---

24. This is the point where most pain is elicited in acute appendicitis.

25. An adnexal mass is a lump in tissue of the adnexa of the uterus which can be benign or cancerous.

scaffolds; she could occasionally balance, stoop, kneel, crouch and crawl; she had no manipulative, visual or communicative limitations; and she had no environmental limitations. Tr. 354-355. Dr. Bonita noted that although Sturges reported few household chores, the evidence suggested that Sturges had the ability to care for herself and maintain her home. Tr. 358. Dr. Bonita further noted that Sturges did not currently attend physical therapy or use a TENS unit, and she did not require an assistive device to ambulate. Id. Dr. Bonita opined that Sturges's description of the severity of her pain, fatigue, and weakness was extreme and unsupported by the medical and other evidence of record. Id.

On April 29, 2009, Sturges had an appointment with Dr. Cohen at which Sturges reported that she did not get a significant benefit from the epidural steroid injections administered by Dr. Mazza. Tr. 380. She further reported that her headaches were doing fair and her vertigo was under control. Id. The notes of this appointment do not reveal any objective physical examination findings. Id.

On June 9, 2009, Sturges had an appointment with Dr. Lycette at which Sturges complained of constant burning and numbness in her hands; bilateral arm weakness and pains; constant neck pain that extended into both shoulders; severe spasms in the muscles between her shoulder blades; mid and low back pain; and pain radiating to her left leg. Tr. 409. However, Sturges denied abdominal pain, vomiting, diarrhea, constipation, tremors, vertigo, headaches and difficulty walking. Tr. 410. She denied depression, anxiety, memory loss, suicidal ideations, hallucinations, paranoia, phobia and confusion. Id. The results of a physical examination were essentially normal. Tr. 411. Sturges had "normal full range of motion of all joints." Id. Sturges's speech was

23

fluent and her cognition intact. Id.  Sturges had essentially normal strength in all major muscle groups. Tr. 412.  She did have slightly decreased strength (4+/5) in the biceps, triceps, and some muscles of the hands and feet and decreased sensation to light touch over the bilateral palms and the ten fingers. Id.  Her deep tendon reflexes in the upper and lower extremities were normal bilaterally. Id.  Dr. Lycette ordered a new MRI of the cervical spine as well as the lumbar spine and prescribed the drugs Calan, Fioricet,[26] Mobic and the narcotic medication Vicodin. Tr. 413.

The MRI of the cervical spine was performed on June 11, 2009, and revealed (1) reversal of the normal cervical lordosis with multilevel degenerative changes, (2) grade 1 retrolisthesis of C3 on C4 and grade 1 anterolisthesis of C4 on C5,[27] (3) severe right and moderate to severe left foraminal stenosis at C3-C4, and (4) a small dorsal central disc herniation at the C5-C6 level with mild to moderate central canal narrowing. Tr. 424-425.  The MRI of the lumbar spine was also performed on June 11, 2009, and revealed a mild disc bulge at the L5-S1 level, no central or foraminal stenosis at any level, and a mild leftward curvature of the lumbar spine which could be partially positional. Tr. 426.

On June 18, 2009, Sturges had a follow-up appointment with Dr. Lycette at which Sturges complained of neck pain, arm pain, difficulty manipulating objects with her

---

26.   Fioricet is a drug containing a combination of acetaminophen ( a pain reliever/fever reducer), butalbital (a barbituate) and cafeine. Fioricet, Drugs.com, http://www.drugs.com/fioricet.html (Last accessed April 21, 2014).  It is used to treat tension headaches. Id.

27.   "Grade 1 is the most minor, with the vertebra only slightly misaligned (up to 25 percent)[.]" What is Grade One Retrolisthesis? http://www.ehow.com/facts_ 5608075_grade-one-retrolisthesis_.html (Last accessed April 22, 2014).

hands and weakness in her left leg accompanied by tingling. Tr. 405-408. It was noted that Sturges continued to smoke. Id. Other than some slightly decreased bilateral grip strength (4+/5) and decreased sensation over the left palm and 5 fingers, the results of a physical examination were completely normal. Tr. 406-407. Sturges had a normal posture and gait; she had full range of motion in the lower and upper extremities; her muscle strength and sensation were completely normal other than as noted; and she had normal deep tendon reflexes in the upper and lower extremities. Id. Dr. Lycette reviewed Sturges's MRI and noted that because there was some abutment with the spinal cord, he recommended a C5-C6 anterior cervical discectomy and fusion to attempt to reduce Sturges's pain. Tr. 408. Sturges in response to that recommendation told Dr. Lycette that she would like to discuss the matter with her family and return later in the summer. Id.

On June 22, 2009, John D. Chiampi, Ph.D., a psychologist, reviewed Sturges's medical records on behalf of the Bureau of Disability determination and concluded that Sturges suffered from depressive disorder, not otherwise specified, but that it was not a severe impairment. Tr. 364, 367 and 374.

On July 14, 2009, Sturges had an appointment with Dr. Cohen at which Sturges told Dr. Cohen that she was going to see Dr. Lycette in two weeks and Dr. Lycette was planning to perform a discectomy, laminectomy and fusion. Tr. 378. The results of a physical examination were completely normal. Id. Sturges had normal coordination; she had normal (5/5) strength in the upper and lower extremities; she had normal sensation and reflexes; and she was able to walk on her heels and toes without

difficulty.[28] Id.  Because Sturges was complaining of headaches and reported that the spinal surgery was not going to take place until October, Dr. Cohen started Sturges on the drug Depakote.[29] Id.

On September 2, 2009, Sturges had an appointment with Dr. Cohen at which Sturges reported that she was very anxious and worried about the surgery which Dr. Lycette was planning to perform on her. Tr.561.  Dr. Cohen gave Sturges a prescription for Xanax, a drug used to treat anxiety disorders. Id.

On September 8, 2009, Sturges had an appointment with Dr. Lycette at which Sturges complained of neck pain; arm pain and weakness; and back pain radiating to the left buttock, leg and foot accompanied by numbness and weakness in the foot. Tr. 400-404.  Other than some slightly reduced strength (4+/5) in the some of the muscle groups of the bilateral upper extremities and the left lower extremity as well as decreased sensation over the bilateral hands and the upper surface of the left foot, the results of a physical examination were completely normal. Tr. 402-403.  It was reported that Sturges had full range of motion in the upper and lower extremities and she had a normal posture and gait. Tr. 402.

---

28.    The heel walk test requires the patient to walk on his heels. The inability to do so suggests L4-5 nerve root irritation. The toe walk test requires the patient to walk on his toes. The inability to do so suggests L5-S1 nerve root irritation. Clinical Examination Terminology, MLS Group of Companies, Inc., https://www.mls-ime.com/articles/GeneralTopics/Clinical%20Examination%20Terminology.html (Last accessed April 21, 2014).

29.    Depakote is a drug used to treat seizure disorder, manic depression and migraine headaches. Depakote, Drugs.com, http://www.drugs.com/depakote.html (Last accessed April 21, 2014).

On October 7, 2009, Sturges had an anterior C5-C6 discectomy with interbody fusion and internal plate fixation performed by Dr. Lycette. Tr. 451-454. Sturges tolerated the procedure well without any complications. Tr. 453. Throughout Sturges's hospital stay, Sturges was assessed as neurologically stable. Id. Sturges was discharged with her pain and headaches under control on October 9, 2009, and was found to have full strength and sensation in her bilateral upper and lower extremities. Id. She was advised not to lift more than 5 to 10 pounds or drive until cleared by her physician. Id.

On October 22, 2009, Sturges had an appointment for a wound check with Rebecca Morgan, a physicians assistant with Dr. Lycette's practice. Tr. 472-474. Sturges reported that her head felt heavy at times and the pressure aggravated her neck pain. Tr. 472. She further stated that her left leg weakness had improved but she continued to have numbness, tingling and weakness occasionally. Id. Sturges reported that she continued to smoke. Id. The results of a physical examination were essentially normal other than reduced muscle strength (4-/5) in some of the muscles of the left foot. Tr. 473. At an appointment with Dr. Cohen on November 12, 2009, Sturges was still complaining of headaches and Dr. Cohen prescribed the drug Inderal.[30] Tr. 562. Dr. Cohen did not record any objective physical examination findings, other than Sturges's blood pressure and pulse which were essentially normal. Id.

On November 24, 2009, Dr. Lycette examined Sturges and reported that Sturges was still complaining of neck pain, arm pain, fatigue and weakness; Sturges was

---

30. Inderal is drug that affects heart and circulation. It is used to treat high blood pressure as well as to reduce the severity and frequency of migraine headaches. Inderal, Drugs.com, http://www.drugs.com/inderal.html (Last accessed April 21, 2014).

27

still smoking;  and Sturges had reduced (4/5) muscle strength in the bilateral upper extremities with poor overall effort. Tr. 475-476.  Sturges had no evidence of sensory loss and the surgical wound appeared well-healed. Tr. 476.  Dr. Lycette noted that Sturges "continue[d] to recuperate well after [surgery]." Id.  Dr. Lycette scheduled a follow-up appointment in December 2009 and indicated that Sturges would start physical therapy at that time. Id.

On December 8, 2009, Sturges had an appointment with physician assistant Morgan at which it was observed that Sturges had somewhat reduced strength (4-/5) in her bilateral upper extremities with little effort but otherwise the physical examination findings were essentially normal and her surgical wound was well-healed. Tr. 478-479. Sturges was referred to physical therapy and a follow-up appointment was scheduled in 8 weeks. Id.

Sturges attended physical therapy from December 17, 2009, through January 14, 2010. Tr. 456-465. On January 26, 2010,  it was reported by Maria Compagnino, a physical therapist, that Sturges had attended 8 out of 10 physical therapy sessions and Sturges had very poor tolerance to exercises, and her symptoms varied significantly each session. Tr. 464.

On January 15, 2010, Sturges had an appointment with Dr. Cohen at which Sturges reported that she was still having headaches but that her neck pain was stable. Tr. 563. Dr. Cohen noted that Sturges was doing fair but Dr. Cohen did not record any objective physical examination findings other than Sturges's blood pressure and pulse. Id. Dr. Cohen increased Sturges's dosage of Inderal and scheduled a follow-up appointment in 6 to 8 weeks. Id.

On January 23, 2010, Sturges had an MRI of the cervical spine which revealed evidence of the cervical spinal surgery, minimal degenerative retrolisthesis of C3 on C4, and mild narrowing of the right neural foramen at C3-C4. Tr. 498.

On January 26, 2010,  at an appointment with physicians assistant Morgan, Sturges reported that she drove to Orlando, Florida two weeks prior to the appointment and went on a ride at a park that exacerbated her neck pain; however, Sturges stated that her headaches had improved. Tr. 481.  Sturges was still smoking. Id.  Other than slightly reduced (4+/5) muscle strength in some of the muscle groups of the upper and lower extremities, the results of a physical examination were essentially normal. Tr. 483-484.  Sturges's gait, posture, sensation and reflexes were normal. Tr. 484.  She had no paraspinal muscle spasm. Id.  She had no cervical spinal tenderness to palpation and a negative bilateral Hoffman's sign. Tr. 483.   She also had negative bilateral straight leg raise tests. Tr. 484.  Ms. Morgan noted that the cervical spine MRI of January 23, 2010, showed stable postoperative changes and multi-level degenerative disc disease. Id.  Ms. Morgan opined that Sturges's increased symptoms were most likely the result of the car ride from Orlando, Florida. Tr. 485.

On March 23, 2010, Sturges had an appointment with Dr. Lycette at which Sturges complained of ongoing arm weakness, neck pain and cramping in her hands and that  her condition was largely unchanged since her last visit. Tr. 486.  She further reported that she had difficulty holding objects and brushing her hair. Id.   The results of a physical examination were essentially normal other than a mild decrease in sensation and slightly reduced grip strength (4/5) in both hands. Tr. 488.  It was noted that she had full strength in the other muscle groups, including her legs. Id.

On April 7, 2010, x-rays of Sturges's cervical spine revealed reversal of the normal cervical lordosis (curvature) with anterior C5-6 fusion changes, no fractures, and unremarkable facet joints. Tr. 467.

On April 20, 2010, Sturges had an appointment with Dr. Cohen. Tr. 565. The report of this appointment reveals no objective physical examination findings but reports that Sturges's was having marital difficulties and was tearful and appeared depressed. Id. Dr. Cohen prescribed the antidepressant Celexa and also the drug Neurontin for neuropathic pain. Id. Also, on April 20, 2010, Sturges underwent and electromyogram which was normal. Tr. 469. Specifically, it revealed "no electrodiagnostic evidence for a cervical (motor) radiculopathy." Id.

On April 27, 2010, Sturges had an appointment with Dr. Lycette at which Sturges reported that she was "feeling better as of late." Tr. 489-492. Although feeling better, Sturges did report daily neck pain and arm pains which varied in intensity and location. Tr. 489. Sturges reported a recent trip to her sister's wedding and that she "overdid it" by engaging in "lots of activities[.]" Id. The results of a physical examination were completely normal. Tr. 490-491. Sturges had normal (5+/5) in all major muscle groups. Tr. 491. Dr. Lycette noted that Sturges was improved and her latest x-rays were stable; and he recommended that Sturges restart physical therapy. Tr. 491.

On May 31, 2010, at 8:35 p.m., Sturges visited the emergency department at the Pocono Medical Center complaining of weakness and dizziness. Tr. 519. After being initially examined, various diagnostic tests were ordered, including a CT scan of the brain and a chest x-ray. Tr. 520-521. The chest x-ray revealed "[n]o evidence of infiltrate or effusion." Tr. 532. The CT scan of the brain revealed "[n]o evidence of acute

30

intracranial abnormality." Tr. 533. During a nursing assessment of Sturges at 9:11 p.m. Sturges was observed to have slurred speech but oriented to person, place and time. Tr. 522. A physical examination performed at 12:00 a.m. is notable because it revealed that when Sturges's neck was examined she had normal range of motion; she had a normal inspection of the back with no tenderness to palpation and no pain with straight leg raising tests; and her extremities were normal, including normal deep tendon reflexes. Tr. 526. The only adverse physical examination findings were positive tenderness in the right lower quadrant of the abdomen and weakness in the upper and lower extremities with expressive aphasia. Id. Sturges was discharged from the hospital on June 1, 2010, in an improved condition with a diagnosis of panic attack. Tr. 530.

On June 8, 2010, Sturges had an appointment with Dr. Cohen. Tr. 566. In the report of that appointment Dr. Cohen did not record any objective physical examination findings and the appointment appears to have been primarily a counseling session where Dr. Cohen addressed Sturges's mental state. Id. Dr. Cohen reported that Sturges was "crying extensively throughout the interview" and "[a]n assessment for depression had to be made and an extensive amount of counseling had to be given[.]" Id. Dr. Cohen increased Sturges's dosage of Celexa and recommended psychological counseling for Sturges and her family. Id. At a follow-up appointment of July 7, 2010, Dr. Cohen reported that Sturges was "doing well." Tr. 567. Sturges told Dr. Cohen that she was to a rheumatologist who confirmed that she had fibromyalgia but no other rheumatological conditions. Id. Dr. Cohen did not report any objective physical examination findings other than she found 8 fibromyalgia trigger points on the front of the body but did not test Sturges's back because of complaints of pain. Id.

31

On August 2, 2010, Sturges had an appointment with physicians assistant Morgan at which Sturges reported that she was unable to attend the recommended physical therapy because she could not find transportation to her appointments. Tr. 493. A physical examination revealed that Sturges's gait and posture were normal; she had no paraspinal muscle spasms; and, with encouragement, her strength was 4+/5 in her bilateral upper extremities. Tr. 495. It was also reported that Sturges had normal hearing; she had fluent speech; her cognition was intact; an inspection of her cervical spine was normal with no deformity or spinal tenderness to palpation; she had a negative Hoffman's sign bilaterally; she had a mild decrease in sensation to light touch in the bilateral hands; her deep tendon reflexes were normal in the upper and lower extremities; and she had a depressed affect. Tr. 495-496. Ms. Morgan reassured Sturges that her most recent MRI from January 2010 did not demonstrate any need for further surgery and that her current back condition would be best managed conservatively at this time. Tr. 496.

The last medical record that we encounter before the ALJ held the hearing on September 8, 2010, and issued his decision on October 27, 2010, is a record of an appointment Sturges had with Dr. Cohen on August 9, 2010. Tr. 568. Dr. Cohen's treatment notes of this appointment do not contain any objective physical examination findings but merely report Sturges's subjective complaints. Tr. 568. Dr. Cohen also did not record any mental status examination findings other than noting that Sturges's reported having suicidal thoughts but was not actively suicidal and did not have a suicide plan. Id.

32

## Discussion

The administrative law judge at step one of the sequential evaluation process found that Sturges had not engaged in substantial gainful work activity since September 29, 2007, the alleged disability onset date. Tr. 14.

At step two of the sequential evaluation process, the administrative law judge found that Sturges had the following severe impairments: "degenerative disc disease; fibromyalgia; depression; and headaches[.]" Tr. 14-15.

At step three of the sequential evaluation process the administrative law judge found that Sturges's impairments did not individually or in combination meet or equal a listed impairment. Tr. 15-17.

At step four of the sequential evaluation process the administrative law judge found that Sturges could not perform her past relevant unskilled to skilled, sedentary to medium work as a telemarketer, department store manager, child care attendant, waitress, and sales/stock person but that she had the ability to perform a limited range of unskilled, light work that does not involve crawling, kneeling or climbing, and only occasionally stooping or bending; and work limited to only simple, repetitive tasks. In setting the residual functional capacity, the administrative law judge found that Sturges's statements concerning the intensity, persistence and limiting effects of her impairments were not credible to the extent that they were inconsistent with her ability to engage in the work as described above. Tr. 18-19 . The ALJ further relied on the opinion of Dr. Bonita who found that Sturges could engage in a range of light work as well as the opinion of Dr. Chiampi who found that Sturges did not suffer from a severe mental impairment although the ALJ gave Sturges the benefit of the doubt based on the

33

depressive disorder diagnosis and limited her to unskilled work involving simple, repetitive tasks. Tr. 24.

Based on the above residual functional capacity and the testimony of a vocational expert the administrative law judge found at step five of the sequential evaluation process that Sturges could perform unskilled work as a ticket taker, locker or check room attendant, photocopy clerk, and order filler, and that there were a significant number of such jobs in the Pennsylvania economy. Tr. 26. The vocational expert identified all of these positions as unskilled, light duty work. Tr. 54-55.

The administrative record in this case is 579 pages in length, primarily consisting of medical and vocational records. Sturges makes a general argument that the ALJ's residual functional capacity assessment is not supported by substantial evidence and that he failed to properly evaluate Sturges's credibility.

We have thoroughly reviewed the record in this case and find no merit in Sturges's arguments. The administrative law judge did an adequate job of reviewing Sturges's vocational history and medical records in his decision. Tr. 12-26. Furthermore, the brief submitted by the Commissioner appropriately reviews the medical and vocational evidence in this case. Doc. 9, Brief of Defendant.

Initially we will note that no treating physician submitted a functional assessment of Sturges to the ALJ which indicated that Sturges was functionally impaired from a physical or mental standpoint for the requisite continuous 12 month period.[31]

---

31. To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."

(continued...)

34

The administrative law judge relied on the opinions of Dr. Bonita who found that Sturges could engage in a range of light work, and although he gave Sturges the benefit of the doubt the ALJ relied on the opinion of Dr. Chiampi who found that Sturges did not suffer from a severe mental impairment. Tr. 24. The administrative law judge's reliance on those opinions was appropriate. See Chandler v. Commissioner of Soc. Sec., 667 F.3d. 356, 362 (3d Cir. 2011)("Having found that the [state agency physician's] report was properly considered by the ALJ, we readily conclude that the ALJ's decision was supported by substantial evidence[.]").

As for Sturges's argument that the administrative law judge did not properly consider her credibility, the administrative law judge was not required to accept Sturges's claims regarding her physical or mental limitations. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing that credibility determinations as to a claimant's testimony regarding the claimant's limitations are for the administrative law judge to make). It is well-established that "an [administrative law judge's] findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the administrative law judge] is charged with the duty of observing a witness's demeanor . . . ." Walters v. Commissioner of Social Sec., 127 f.3d 525, 531 (6th Cir. 1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991)("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess the witness credibility."). Because the administrative law judge

---

31.   (...continued)
42 U.S.C. § 432(d)(1)(A).

observed and heard Sturges testify, the administrative law judge is the one best suited to assess her credibility.

We are satisfied that the administrative law judge based on the evidence before him appropriately took into account all of Sturges's mental and physical limitations in the residual functional capacity assessment.

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence.  We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner.

An appropriate order will be entered.

Robert D. Mariani
United States District Judge

Date: April 20 , 2014

36